James WEED, Juranda Faith Madson a/k/a Jan Madson, Bruce Senkow, and John Bennett, individually, Petitioners,

v.

BACHNER COMPANY INC., and Bowers Investment Company, Respondents.

No. S–13284.

Supreme Court of Alaska.

May 14, 2010.

Janell M. Hafner, Assistant Attorney General and Richard A. Svobodny, Acting Attorney General, Juneau, for Petitioners.

Michael C. Kramer, Borgeson & Burns, P.C., Fairbanks, for Respondents.

Before: CARPENETI, Chief Justice, FABE, and CHRISTEN, Justices.

*OPINION*

CARPENETI, Chief Justice.

## I. INTRODUCTION

The sole question in this case is whether state procurement officials are entitled to absolute immunity or qualified immunity for common law claims arising from the bid evaluation process. In this case, a disappointed bidder sued the procurement officials individually after the administrative hearing officer in the bid protest proceeding found serious improprieties in the bid evaluation process. The officials moved for dismissal on the ground that they were absolutely immune. The superior court held that they were protected instead by only qualified immunity, which applies only to actions taken in good faith. Because the complaint alleged bad faith, the court further held that most of the causes of action could go forward. We accepted the officials' petition for review. Applying our three-factor test, we conclude that the officials are entitled only to qualified immunity, and therefore affirm the decision of the superior court.

## II. FACTS AND PROCEEDINGS

This is the second time this matter comes before us.[1] Bachner Company and Bowers Investment Company (Bachner) were unsuccessful bidders on a state contract ultimately awarded to McKinley Development.[2] Bachner filed bid protests alleging irregularities in the bid scoring process.[3] The hearing officer who heard the matter found "grave deficiencies" in four of the five evaluations by procurement officials (the petitioners here) in the bid award process, and ultimately awarded Bachner its bid preparation costs.[4] Bachner appealed that decision to the superior court, arguing that the hearing officer should have ordered the bids re-scored or re-opened.[5] Bachner was successful in the superior court, but we reversed that court and affirmed the hearing officer's recommendation.[6]

1. *See State, Dep't of Admin. v. Bachner Co.,* 167 P.3d 58 (Alaska 2007).

2. *Id.* at 59–60.

3. *Id.* at 60.

4. *Id.*

5. *Id.*

6. *Id.* at 62.

Before we had decided that appeal, Bachner sued the four procurement officials as individuals. The complaint alleged that the procurement officials failed to follow required procedure for scoring bids. It claimed that: (1) Senkow and Bennet favored McKinley's bid because of McKinley's site location, which was not one of the exclusive criteria they were permitted to consider; (2) Madson advised Senkow and Bennet they could not consider the location, but they did not lower their scores; (3) Weed intentionally lowered his score on Bachner's bid in order to counteract what he perceived as favoritism of that bid by another officer; and (4) after Bachner filed its protest, Madson intentionally misstated that time constraints prevented the state from postponing award of the contract while the protest was pending. Bachner stated two causes of action arising from these alleged facts: the state tort claim of intentional interference with prospective economic opportunity and a federal tort claim under 42 U.S.C. section 1983. The defendant procurement officials then moved to dismiss on the pleadings.

Superior Court Judge Mark I. Wood granted dismissal of Bachner's section 1983 action, but refused to dismiss Bachner's claim under state tort law. Judge Wood specifically rejected the defendant procurement officials' claims that their actions were protected by absolute immunity. The court held that the defendants were protected only by qualified immunity, and that certain alleged actions, if true, would fall outside the scope of that immunity. The procurement officials petitioned for discretionary review to address whether they are entitled to absolute immunity, and we granted that petition.

## III. STANDARD OF REVIEW

The applicability and scope of official immunity is a question of law, which we review *de novo*.[7]

## IV. DISCUSSION

This case presents a single, discrete question: Are the procurement officials entitled to absolute or qualified immunity for allegedly tortious conduct arising out of actions they took in the course of the bid evaluation process? This is the first time we have ever directly addressed this question.[8] Bachner did not cross-appeal the superior court's holding that the procurement officers are protected by official immunity[9]—the only question is whether that immunity is qualified or absolute. If the immunity is qualified, Bachner will be able to proceed with its claims that the procurement officers acted maliciously and in bad faith.[10]

In *Aspen Exploration Corp. v. Sheffield*,[11] we first set out a three-factor test for determining whether an official is entitled to absolute or qualified immunity. The three factors we consider are: (1) the nature and importance of the official function to government administration; (2) the likelihood that the official will frequently be accused of wrongful motives in performing this function, and how easily the officer can defend against those accusations; and (3) the availability of other relief to an injured party.[12] We have applied this three-factor test in several contexts, holding that the governor is entitled to absolute immunity when supervising permitting decisions,[13] while social workers[14] and

---

7. *Aspen Exploration Corp. v. Sheffield*, 739 P.2d 150, 154 (Alaska 1987).

8. In *J & S Servs. v. Tomter*, 139 P.3d 544, 549 (Alaska 2006), we did briefly address this question in dicta, hypothesizing that it was likely that a thorough analysis would lead us to conclude that procurement officials were entitled to absolute immunity. However, we explicitly declined to resolve the issue. *Id.*

9. Official immunity applies to official, discretionary actions within the scope of the officials' authority. *Smith v. Stafford*, 189 P.3d 1065, 1072 (Alaska 2008).

10. *Aspen Exploration Corp.*, 739 P.2d at 158 ("Under the rule of qualified immunity, a public official is shielded from liability only when discretionary acts within the scope of the official's authority are done in good faith and are not malicious or corrupt.").

11. 739 P.2d 150 (Alaska 1987).

12. *Id.* at 159–60.

13. *Id.* at 162 (but granting only qualified immunity for defamatory statements).

14. *Smith*, 189 P.3d at 1073.

state troopers [15] are entitled only to qualified immunity for their actions. Applying this same three-factor test to the present context, we conclude that the procurement officers in this case are entitled to qualified immunity.[16]

"Under a rule of qualified immunity, a public official is shielded from liability . . . when discretionary acts within the scope of the official's authority are done in good faith and are not malicious or corrupt. In other words, 'malice, bad faith or corrupt motive transforms an otherwise immune act into one from which liability may ensue.' "[17] As we stated in *Aspen Exploration*, the purpose of qualified immunity is to "protect the honest officer who tries to do his duty" while ensuring that "official immunity [does] not become a cloak for malicious, corrupt, and otherwise outrageous conduct on the part of those guilty of intentional abuse of power with which they are entrusted by the people."[18]

### 1. Nature and importance of the function

The first factor is: "The nature and importance of the function that the officer performed to the administration of government (i.e. the importance to the public that this function be performed; that it be performed correctly; that it be performed according to the best judgment of the officer unimpaired by extraneous matters) . . . ."[19]

The procurement officials argue that their functions play a critical role in "ensuring the state receives needed services and products across a range of departments and agencies at a reasonable cost." They compare the importance of their functions to the governor's function in rejecting the oil company's permit in *Aspen Exploration*. In *Aspen Exploration*, we found the governor's function sufficiently important to support absolute immunity.[20] The procurement officials argue that, although any individual officer's function may seem unimportant, in the aggregate they are essential to the smooth administration of government.

Bachner responds that the importance of the bidding process is the prevention of "fraud, collusion, favoritism and improvidence" in the awarding of public contracts, and therefore, this first factor weighs against absolute immunity. Bachner also distinguishes this case from *Aspen Exploration*, pointing out that governors and others in high state office are traditionally protected by absolute immunity, unlike lower-level officials.

As to this first factor, we find Bachner's argument more persuasive. We agree that this case is distinct from *Aspen Exploration*: Although the oil company in that case challenged the governor's instruction to the commissioner to reject the company's permit application, we considered the function at issue to be the governor's supervision of his subordinates.[21] We observed that the governor, as an elected official, has great responsibility to supervise unelected subordinates.[22] We also noted that these concerns are particularly important where the state's natural resources are concerned.[23] Consequently, our discussion of this factor in *Aspen Exploration* does not favor absolute immunity in the present case.

We also agree with Bachner that an important purpose of the bidding process is to create transparency in the state's procurement system, and to avoid awarding con-

15. *Prentzel v. State, Dep't of Pub. Safety*, 169 P.3d 573, 584–85 (Alaska 2007).

16. This petition does not present the question whether the exclusive remedy provision of the procurement code bars claims against procurement officials in their individual capacity.

17. *Aspen Exploration Corp. v. Sheffield*, 739 P.2d 150, 158 (Alaska 1987) (quoting *Shellburne, Inc. v. Roberts*, 238 A.2d 331, 338 (Del.1967)) (internal citation omitted).

18. *Id.* at 158 (quoting W. Prosser, HANDBOOK OF THE LAW OF TORTS, § 132 at 989 (4th ed.1971)) (internal quotation marks omitted).

19. *Aspen Exploration*, 739 P.2d at 159–60.

20. *Id.* at 160.

21. *Id.*

22. *Id.*

23. *Id.*

tracts based on improper considerations,[24] and that this purpose weighs in favor of applying qualified immunity to procurement officers. Finally, we conclude that the highly restricted nature of a procurement officer's discretion also makes this factor weigh in favor of qualified immunity. Unlike the governor's function in supervising his or her subordinates—which requires that the governor's discretion and judgment remain largely unfettered—the role of a procurement officer in selecting bids involves a brand of discretion that is extraordinarily limited: Procurement officers are only allowed to consider those factors that the Procurement Code specifically lays out.[25] We conclude that these statutory limitations on the officials' discretion also weigh in favor of qualified immunity. Although we are sympathetic to the officials' argument that the smooth functioning of the procurement decision-making process is important to the efficient administration of government, we believe that the other considerations discussed here tip the balance in favor of qualified immunity.

### 2. Likelihood of litigation and burden of defense

■ The next factor we consider is: "The likelihood that the officer will be subjected to frequent accusations of wrongful motives and how easily the officer can defend against these allegations. . . ." [26] The procurement officials argue that awarding a contested bid always results in dissatisfied bidders who will be "invited" to sue the officials personally unless they are absolutely immune. They point out that disappointed bidders frequently file bid protests. They argue that the "competitive nature and large sums of money at issue in the procurement process make this outcome inevitable." They also argue that defending such actions will be expensive

and time-consuming because of the subjective nature of the decisions and the lack of clear tort principles applicable to them. Bachner responds that defending against this kind of litigation will not be nearly as burdensome as the officials argue. It argues that the bid protest process will both screen out frivolous suits, and give officials notice and a preliminary opportunity to prepare their defenses.

Although it might sound intuitively correct that qualified immunity would increase the likelihood of tort suits in this context, as the officials argue, intuition alone is not sufficient: In evaluating this factor in the past, we have required empirical evidence that frequent suits are likely. In *Aspen Exploration*, we noted that "it would seem that the very nature of [the governor's] high office would make the governor a ready target for numerous lawsuits." [27] However, we went on to observe that, in fact, Aspen Exploration was the first personal tort suit against the governor to reach this court, stating: "Neither party points to any trend, past or present, indicating that governors in general have been the target of a disproportionate number of lawsuits and our own research fails to denote any such phenomena." [28] We concluded that in the absence of hard evidence showing that numerous suits were likely, the first prong of this factor—the likelihood of frequent litigation—would weigh in favor of qualified immunity.[29]

In *Smith v. Stafford*,[30] we took the same approach. In an appeal from a personal tort suit against the social workers who had handled the plaintiff's daughter's Child in Need of Aid (CINA) proceeding, we concluded that this factor favored qualified immunity because there was "no evidence that under

---

24. *See McBirney & Assocs. v. State*, 753 P.2d 1132, 1135–36 (Alaska 1988) ("The purposes of competitive bidding are 'to prevent fraud, collusion, favoritism, and improvidence in the administration of public business, as well as to insure that the [state] receives the best work or supplies at the most reasonable prices practicable.' " (quoting *Gostovich v. City of West Richland*, 75 Wash.2d 583, 452 P.2d 737, 740 (1969)) ) (brackets in original).

25. AS 36.30.250.

26. *Aspen Exploration Corp. v. Sheffield*, 739 P.2d 150, 160 (Alaska 1987).

27. *Id.* at 161.

28. *Id.*

29. *Id.*

30. 189 P.3d 1065 (Alaska 2008).

qualified immunity social workers would be subjected to frequent lawsuits." [31] We noted that, despite the "highly emotional" nature of CINA proceedings, "the level of emotion involved does not necessarily translate into a high number of lawsuits against social workers." [32] Concluding that this factor favored qualified immunity, we stated: "Historically, these types of suits have been relatively rare, and [the social workers] present no empirical evidence that more lawsuits [would] result...." [33]

Similarly, the procurement officials here do not offer any empirical evidence in support of their argument. And our independent research suggests that these types of suits are infrequent: Although this court often sees appeals from administrative bid protests,[34] we have only seen one tort suit against an individual procurement officer.[35] Because arguments based solely on intuition are unpersuasive in this context and the empirical evidence actually suggests that frequent suits are *unlikely*, we conclude that the first prong of this factor favors qualified immunity.

We are similarly unpersuaded by the officials' argument with respect to this factor's second prong: the ease with which the officials will be able to defend themselves against suits of this kind. We agree with Bachner's argument that most, if not all, unsuccessful bidders who file a tort suit will also file an administrative bid protest, and therefore, the officers will first be required to defend their subjective decision in that context. It is likely that much of the civil trial will involve the claims and defenses made in the administrative protest, substantially easing the officers' burden of preparing a defense for the purpose of litigation. While we see some force in the officials'

argument that such lawsuits would turn largely on questions of fact, and therefore, require expensive presentation of the issues to a jury, we do not think that this alone tips the balance in favor of absolute immunity. In light of the foregoing discussion, we conclude that this second factor also favors qualified immunity.

### 3. Availability of alternative relief

■ Finally, we consider: "The availability to the injured party of other remedies or other forms of relief (i.e. whether the injured party can obtain some other kind of judicial review of the correctness or validity of the officer's action)." [36] The procurement officials argue that the availability of other avenues of relief—the bid protest process, criminal law, and the Alaska Executive Branch Ethics Act—cause this factor to weigh in favor of absolute immunity.

As to the bid protest process, the procurement officials argue that it constitutes a comprehensive alternative remedy. The officials assert that the bid protest process provides for a hearing before an administrative law judge, who will fashion an appropriate remedy depending on the nature of the impropriety.[37] These could include awarding the disappointed bidder bid preparation costs, rescoring of the bids, or even issuing a new request for bids. Further contributing to the comprehensiveness of this remedy, these proceedings are subject to appeal and judicial review.[38]

Bachner responds that bid preparation costs can be a "pittance" when compared to the damages available in tort, and that the prospect of receiving bid preparation costs alone will not sufficiently incentivize disappointed bidders to engage in the protest

---

31. *Id.* at 1073.

32. *Id.*

33. *Id.*

34. *See, e.g., Lakloey, Inc. v. Univ. of Alaska,* 141 P.3d 317 (Alaska 2006); *Kila, Inc. v. State, Dep't of Admin.,* 876 P.2d 1102 (Alaska 1994); *Bowers Office Prods., Inc. v. Univ. of Alaska,* 755 P.2d 1095 (Alaska 1988).

35. *See J & S Servs. v. Tomter,* 139 P.3d 544 (Alaska 2006).

36. *Aspen Exploration Corp. v. Sheffield,* 739 P.2d 150, 160 (Alaska 1987).

37. AS 36.30.585.

38. In fact, we have previously affirmed the hearing officer's decision to award Bachner its bid preparation costs. *State, Dep't of Admin. v. Bachner Co.,* 167 P.3d 58 (Alaska 2007).

process. It urges us to adopt the superior court's view that "[n]othing in the current system holds [procurement officials] accountable for their performance of their duties." The superior court considered it necessary to the fairness and accountability of the system to afford procurement officials immunity only for those actions taken in good faith—i.e., qualified immunity.

Here, we think that the procurement officials have the better argument. In *Aspen Exploration*, we concluded that a similar administrative process was an adequate alternative remedy for purposes of this factor.[39] Although the hearing officer may not award money damages greater than bid preparation costs, the hearing officer may fashion an appropriate remedy, including sending the bids back for re-scoring or re-opening the bidding process.[40] These are much more comprehensive remedies than are available in a civil suit. Although in this case the hearing officer awarded Bachner only its bid preparation costs, Bachner had its chance at greater remedies.[41] The bid protest process is comprehensive, and reflects the legislature's scheme for redressing injury in the procurement process. Thus, we conclude that this factor favors absolute immunity.

As to the role that criminal law and the Alaska Executive Branch Ethics Act[42] play in providing an alternative avenue of relief, we are not persuaded of their relevance. As the procurement officials argue, both criminal law and the Ethics Act provide additional checks on impropriety in procurement,[43] but this does not speak to the availability of relief and judicial review *to the injured party*, which is what this factor concerns. Furthermore, both criminal law and the Ethics Act apply to *all* executive officials,[44] so if we did consider them adequate alternative remedies, this factor would always weigh in favor of finding executive officials absolutely immune. For this reason, it adds little to the analysis. Regardless, because we think the bid protest

process *does* provide an adequate alternative remedy for disappointed bidders, we conclude that this factor weighs in favor of absolute immunity.

### 4. Balancing the factors

■ Weighing these factors together, we agree with the superior court's conclusion that the procurement officials are entitled only to qualified immunity. Although the final factor suggests that procurement officers should be absolutely immune, the first two factors tip the balance in favor of qualified immunity. This is not a situation where unfettered discretion is crucial to the best interests of the public; indeed, the procurement officers' discretion is designed to be highly restricted. Moreover, there is no evidence that procurement officials are often sued in tort, and the bid protest process makes it likely that the officials will be well-prepared to defend suits when they do arise. Finally, as we have noted before, we have generally extended absolute immunity only to the highest levels of government officials, and afforded only qualified immunity to lower-level officials.[45] Thus, we conclude that, in defending against common law claims arising out of actions taken in the bidding process, procurement officers are entitled only to qualified immunity.

We take this opportunity to reiterate that qualified immunity still provides the officials with substantial protection from liability. Qualified immunity protects an official who has merely acted negligently, and it might even protect an official for liability arising out of a knowing violation where that official lacked the requisite degree of bad faith. The standard is similar to the one our legislature has articulated in the punitive damages context: For an official with qualified immunity to be held liable, his conduct must have been outrageous or evidenced reckless indifference

---

**39.** *Aspen Exploration,* 739 at 161–62.

**40.** AS 36.30.585; *Bachner,* 167 P.3d at 60.

**41.** *Bachner,* 167 P.3d at 60.

**42.** AS 39.52.010 *et seq.*

**43.** *See id.*

**44.** *See* AS 39.52.910.

**45.** *Smith v. Stafford,* 189 P.3d 1065, 1073 (Alaska 2008).

to the interest of another person.[46] Thus, qualified immunity still affords officials, like the procurement officers, substantial protection from liability for actions taken within the scope of their authority.

## V. CONCLUSION

After applying the three-factor test, we conclude that qualified immunity is appropriate, and AFFIRM the superior court's conclusion.

EASTAUGH and WINFREE, Justices, not participating.

FABE, Justice, concurring.

I agree with the court's conclusion that procurement officials are entitled only to qualified immunity. I write separately to express my view that the exclusive remedy provision of the procurement code may bar lawsuits such as this one. Under the exclusive remedy provision, the procurement code and its implementing regulations "provide the exclusive procedure for asserting a claim against an agency arising in relation to a procurement."[1] Claims against procurement officials in their individual capacity for performing usual and proper duties might fairly be characterized as "claim[s] against an agency," even where bad faith is alleged; they would thus be barred by the exclusive remedy provision.[2] In this lawsuit, Bachner's allegations of misconduct—improperly scoring proposals, improperly overseeing the scoring process, and improperly deciding to proceed with a contract award—all relate to the usual and proper duties of procurement officials.[3] However, the case is before us on a limited petition for review. We are not presented with the question of the scope of the exclusive remedy provision, nor asked to decide whether it bars this lawsuit. Therefore, I concur with the court's opinion.

46. AS 09.17.020 provides:
(b) The fact finder may make an award of punitive damages only if the plaintiff proves by clear and convincing evidence that the defendant's conduct
(1) was outrageous, including acts done with malice or bad motives; or
(2) evidenced reckless indifference to the interest of another person.

1. AS 36.30.690.

2. See *J & S Servs., Inc. v. Tomter*, 139 P.3d 544, 548 (Alaska 2006) (suggesting that "claims against . . . a procurement officer acting within the course and scope of his duties" would appear to be barred by the exclusive remedy provision).

3. These allegations are distinguishable from those in *J & S Services*, where we held that the exclusive remedy provision did not necessarily bar a lawsuit against a procurement official in his individual capacity. *Id.* at 547, 549, 552. There, the procurement official was alleged to have actively assisted the winning bidder (a company formed by one of his friends) and made arrangements to receive kickbacks from the winning bidder.